IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MUNICIPAL MORTGAGE & :
EQUITY, LLC, :
    Plaintiff :
  :
v. : CIVIL NO. AMD 00-171
  :
SOUTHFORK APARTMENTS :
LIMITED PARTNERSHIP, :
    Defendant :
...o0o...

MEMORANDUM

Municipal Mortgage & Equity, LLC, a Delaware limited liability company with its principal place of business in Baltimore and the successor to SCA Tax Exempt Fund Limited Partnership (hereafter "MuniMae"), has brought this diversity action against Southfork Apartments Limited Partnership ("Southfork"), a limited partnership organized under the laws of Minnesota. MuniMae seeks a declaratory judgment pursuant to 28 U.S.C. § 2201(a) establishing the priorities of certain amounts owed by Southfork upon Southfork's contemplated prepayment of principal and interest under certain loan agreements entered into by the parties in January 1988.

Pending before me is Southfork's motion to dismiss for lack of personal jurisdiction, improper venue and failure to join an indispensable party. *See* Fed.R.Civ.P. 12(b)(2), (3) and (7). The issues have been fully briefed and no hearing is necessary. For the reasons set forth below, I am persuaded that the exercise of jurisdiction over Southfork under the circumstances here would not comport with the fundamental fairness required by the Due



Process Clause of the Fourteenth Amendment. Accordingly, I will grant Southfork's motion to dismiss.

I

Effective on January 1, 1988, for the purpose of developing a low and moderate income multifamily housing project (the "Project"), Southfork and the City of Lakeville, Minnesota ("Lakeville"), acting through its Housing and Redevelopment Authority, entered into a loan agreement in the amount of $10,375,000 (the "Loan Agreement"). The loan was secured by a Promissory Note and Mortgage, as well as Southfork's assignment to Lakeville of the Project's rents and leases (the "Security"). To finance the loan, Lakeville issued tax-exempt, twenty-year revenue bonds (the "Bonds"), which MuniMae had agreed to purchase.

MuniMae had initially chosen a party other than Southfork to develop the Project. When the financing arrangements with that party fell through, MuniMae approached Southfork. After a meeting between the parties' representatives in Minnesota, Southfork submitted an application to MuniMae to finance the Project. Upon the completion of preliminary negotiations, MuniMae issued a Commitment Letter (the "Commitment") to Southfork, dated December 9, 1987, memorializing MuniMae's willingness to purchase the Bonds issued by Lakeville to finance the Project. The Commitment was conditioned on, *inter alia*, the attainment by Southfork of tax increment financing from Lakeville. Southfork accepted the Commitment on December 11, 1987. MuniMae purchased the Bonds and augmented the original loan amount by $175,000, in the form of a parity working capital

loan, for a total of $10,555,000 in proceeds to Southfork.

The bond purchase and additional parity working capital loan were consummated as contemplated by, and contemporaneously with, the Loan Agreement through an Indenture of Trust Agreement (the "Indenture," together with the Loan Agreement, the "Loan Documents") between Lakeville and Sovran Bank/Maryland, as trustee for MuniMae (the "Trustee"). Under the terms of the Indenture, Lakeville assigned substantially all of its rights and interest in the Bonds and the Security to the Trustee and the Trustee transferred the proceeds to Southfork.[1] In satisfaction of the Commitment's tax increment financing condition and concurrently with the execution of the Loan Documents, Southfork and the Housing and Redevelopment Authority of Lakeville (the "Authority") entered into an Interest Reduction Loan Agreement (the "Interest Agreement") in which the Authority agreed to lend to Southfork, in the form of an immediate tax rebate, fifty percent of real estate levies on the Project.

During the construction of the Project, which the Loan Documents envisioned to be completed in or around December 1988, Southfork periodically received, upon its written request sent from Minnesota to MuniMae in Maryland, a release of construction funds which were transmitted, upon MuniMae's approval, by the Trustee from Maryland. Following the

---

[1] Lakeville retained the right to payment for extraordinary services incurred in enforcement Southfork's obligations under the Loan Documents, *see* Loan Agreement at § 5.03, and the right to indemnification for certain conflicts arising out of the transaction, *see id.* at § 7.01.

completion of the Project's construction, Southfork continued to send periodic interest payments and bond servicing fees to the Trustee, which, in turn, transmitted them to MuniMae. Between 1988 and 1995, Southfork sent interest payments and bond servicing fees to the Trustee in Maryland. Since 1995, Southfork has sent interest payments and servicing fees to a successor Trustee in New York. In addition to sending interest payments and servicing fees to the Trustee, Southfork submits the Project's monthly leasing and operating reports, quarterly cashflow reports, annual budgets and annual financial statements to MuniMae for audit and review in Maryland. Further, representatives from MuniMae travel from Maryland to perform an annual physical inspection of the Project in Lakeville.

The parties do not dispute that all face-to-face negotiations leading up to the transaction, and all subsequent face-to-face meetings, if any, occurred in Minnesota. Nor do they dispute that the transaction was negotiated by local Minnesota counsel for all parties and was ultimately consummated in Minnesota. None of Southfork's partners is a citizen of Maryland. The Project, located in Lakeville, was designed by Minnesota architects, built by Minnesota contractors, financed by municipal bonds issued and tax increment subsidization provided by Lakeville.

While the Commitment designates Maryland law under its choice of law provision,[2] the Loan Documents, negotiated by local Minnesota counsel for all parties and executed

---

[2] *See* Commitment at § 24 ("Choice of Law - The rights and obligations of the parties with respect to this Commitment shall be determined in accordance with the State of Maryland").

approximately a month later, designate Minnesota law.[3] The Loan Agreement contains a merger clause which provides that "[t]his Agreement and the other Mortgage Loan Documents constitute the entire agreement among the parties hereto with respect to the transactions contemplated herein and therein, and *supersede all prior oral or written agreements, commitments* or understandings with respect to the matters provided for herein and therein." Loan Agreement at § 10.17 (emphasis added).

## II

Where, as here, a hearing is not held, in order to defeat a motion to dismiss for lack of personal jurisdiction, *see* Fed.R.Civ.P. 12(b)(6), the plaintiff's burden is to establish *prima facie* that personal jurisdiction is proper under the Maryland Long-Arm Statute and consonant with due process considerations. *See Choice Hotels, Int'l, Inc. v. Madison Three, Inc.*, 23 F.Supp.2d 617, 619 & n.1 (D.Md. 1998) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993) and *Blue Ridge Bank v. Veribanc, Inc.*, 755 F.2d 371, 373 (4th Cir.1985)). In considering a challenge to personal jurisdiction, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Bakker*,

---

[3]*See* Loan Agreement at § 10.10 ("Applicable Law. The laws of the State shall govern the construction of this Agreement"); Exhibit C to Loan Agreement at C-2 ("'State' - The State of Minnesota"); Indenture at § 14.05 ("Governing Law. The substantive laws of the State shall govern this Indenture and all Bonds issue hereunder."); *id.* at § 14.08 ("Intention as to Seal and Contract. It is intended that this Indenture, when signed on behalf of [Lakeville] and [Sovran] . . . shall constitute a contractual obligation under seal under the laws of the State with force and effect as an agreement . . . ."); Exhibit B to Indenture at B-2 ("'State' - The State of Minnesota").

886 F.2d 673, 676 (4th Cir. 1989).

Both Maryland appellate courts and the United States Court of Appeals for the Fourth Circuit "have shown a willingness to collapse [the long-arm and constitutional] inquiries into a single analysis, since the Maryland Long-Arm Statute is to be interpreted as extending to constitutional limits." *Choice Hotels*, 23 F.Supp.2d at 619 (citing Maryland and Fourth Circuit personal jurisdiction precedent).[4]

The Supreme Court has explained that a court may constitutionally exercise specific jurisdiction over a defendant when a cause of action arises out of the defendant's minimum contacts with the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). Based on the submissions of the parties, the exercise of personal jurisdiction over Southfork in this case, if at all, must be based on specific, as opposed to general, jurisdiction.

The exercise of specific personal jurisdiction here requires a prima facie showing by MuniMae that (1) Southfork purposely directed its activities toward MuniMae, a resident of Maryland, the forum state, or purposely availed itself of the privilege of conducting activities here; (2) MuniMae's cause of action arises out of or results from Southfork's Maryland-related contacts; and (3) Maryland's exercise of personal jurisdiction in the case

---

[4]The provision of Maryland's Long-Arm statute relevant here provides: "In general.--A court may exercise personal jurisdiction over a person, who directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State . . . ." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1).

is reasonable, i.e., is consistent with "fair play and substantial justice." *See Choice Hotels*, 23 F.Supp.2d at 620 (quoting *Cape v. von Maur*, 932 F.Supp. 124, 126 (D.Md. 1996) and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477-78 (1985)).

In assessing the sufficiency of Southfork's contacts with the Maryland for long-arm and constitutional purposes, the "touchstone" is whether Southfork's contacts were "purposefully established" by Southfork such that it "will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Choice Hotels*, 23 F.Supp.2d at 620 (citing *Burger King*, 471 U.S. at 474-75 (citations omitted)). "Prior negotiations and contemplated future consequences along with the terms of the contract and the parties' actual course of dealing," *Burger King*, 471 U.S. at 479, are the relevant evaluative factors in determining whether Southfork has purposefully established the requisite contacts in Maryland.

In fleshing out the meaning of "prior negotiations and contemplated future consequences," "courts have considered various factors in the contract situation, including [where] the parties contemplated that the work would be performed, where negotiations were conducted . . . [and] where payment was made . . . . The strongest factor that seems to have emerged, however, is a determination of whether the defendant initiated the business relationship in some way." *Nueva Eng'g, Inc. v. Accurate Electronics, Inc.*, 628 F.Supp. 953, 955 (D.Md. 1986); *Potomac Design, Inc. v. Eurocal Trading, Inc.*, 839 F.Supp. 364, 370 (D.Md. 1993) (citing *Nueva Eng'g*).

III

I agree with Southfork that application of the above principles to the circumstances established in the record here fails to establish *prima facie* that Southfork has purposefully availed itself of the benefits and protections of Maryland law such that the exercise of jurisdiction over Southfork would be fair and reasonable in this declaratory judgment action. Accordingly, Southfork is not subject to the exercise of specific personal jurisdiction in this case.

First, as to the determination of who initiated the business relationship, *see Nueva Eng'g,* 628 F.Supp. at 955 (citing *August v. HBA Life Ins. Co.,* 734 F.2d 168 (4th Cir. 1984) and *Vishay Intertechnology, Inc. v. Delta Int'l Corp.,* 696 F.2d 1062 (4th Cir. 1982)); *Potomac Design,* 839 F.Supp. at 370, the submissions of the parties establish unmistakably that MuniMae courted Southfork.

MuniMae argues that Southfork initiated the business relationship between the parties when Southfork submitted an application to MuniMae to finance the Project. Contrary to MuniMae's assertion, however, the two affidavits by Thomas H. Healy, chairman of Southfork's general partner, establish that the relationship was initiated when a representative of MuniMae traveled to Minnesota to secure Southfork as the developer of the Project after arrangements with the first developer had fallen through. MuniMae's affidavit, provided by its Senior Vice President, Earl W. Cole, III, in asserting that "Southfork's application for financing was reviewed and approved in Baltimore" is obfuscatory at best on this issue. It

does not, in any event, undermine the conclusion that MuniMae, rather than Southfork, initiated the transaction.

Second, as to the "prior negotiations" between the parties, *Burger King*, 471 U.S. at 479; *Nueva Eng'g*, 628 F.Supp. at 955, it is undisputed that all face-to-face negotiations between the parties occurred in Minnesota by local Minnesota counsel for all parties. The Loan Documents, moreover, were executed in Minnesota.

Third, as to where the parties contemplated performance was to occur, *Nueva Eng'g*, 628 F.Supp. at 955; *Potomac Design*, 839 F.Supp. at 37, the submissions of the parties establish that the Project was designed by an architect in Minnesota, constructed by local Minnesota contractors, managed by Southfork, a Minnesota limited partnership, and financed in part and regulated by Lakeville, a Minnesota municipality. MuniMae attempts to cast this transaction purely in terms of a bond purchase arrangement. Manifestly, this strained view is divorced from the inherent nature of the parties' undertaking, which was, in essence, a venture to finance and construct a housing project in Minnesota in cooperation with Southfork, a private developer, and Lakeville, a Minnesota municipality.

Fourth, as to the parties' course of dealing, the facts indicate that Southfork did not avail itself of the benefits and protections of Maryland law.

MuniMae seizes upon *Burger King* and, among other cases, my relatively recent opinion in *Choice Hotels Int'l* to highlight the parallels between Southfork and the franchisees who were ultimately found subject to personal jurisdiction in those cases. Like

those franchisees, MuniMae argues, Southfork entered into a "carefully structured 20-year relationship that envisioned continuing and wide- reaching contacts," *Burger King*, 471 U.S. at 480, with MuniMae in Maryland and, consequently, a relationship by which Southfork necessarily availed itself to the benefits and protections of Maryland law.

In *Burger King* and *Choice Hotels*, the franchisees "purposefully availed [themselves] of the benefits of [the forum's] law by entering into . . . significant long-term commercial franchise agreement[s] from which substantial benefits would accrue" to them in their respective states from a citizen of the forum state. *Choice Hotels*, 23 F.Supp.2d at 620; *Burger King*, 471 U.S. at 478-82. The franchise agreements in those cases provided for the use of "trademarks and service marks," the acquisition of a "variety of proprietary information concerning standards, specifications, procedures and methods for operating," *Burger King*, 471 U.S. at 465, the receipt of market research and inventory-control guidance, and allowed the franchisees to "tap into . . . established national reputation[s] and to benefit from proven procedures . . . enabl[ing the franchisees] to go into . . . business with significantly lowered barriers to entry." *Id.*; *Choice Hotels*, 23 F.Supp.2d at 620 (drawing similarities between franchise agreement at issue with the franchise agreement in *Burger King*).

In return for these benefits, the franchisees "commit[ted] themselves to payment of monthly royalties, advertising and sales promotion fees, and rent computed in part from monthly gross sales." *Burger King*, 471 U.S. at 465; *Choice Hotels*, 23 F.Supp.2d at 619

(discussing franchise fees). Further, and importantly, the franchisees agreed to submit to "exacting regulation of virtually every conceivable aspect of their operations," which included the imposition of "standards and . . . rigid regulation out of conviction that '[u]niformity of service, appearance, and quality of product is essential to the preservation' of the franchisor's image and the benefits accruing therefrom to both Franchisee and Franchisor." *Burger King*, 471 U.S. at 465.

The Loan Documents, by contrast, reveal that the relationship between the parties was not as "carefully structured . . . and wide- reaching," *id.* at 480, as MuniMae suggests. Under the Loan Documents, Southfork was only required during the construction of the Project to request construction funds from the Trustee, which was at the time located in Maryland. Following completion of the Project's construction through 1995, Southfork sent interest payments and bond servicing fees to the Trustee in Maryland. After 1995, Southfork sent payments to a successor Trustee in New York. In addition, the Loan Documents required Southfork to send the Project's progress and operating reports to MuniMae in Maryland. The dispatches between Southfork and MuniMae do not rise to the level of "exacting regulations of every conceivable aspect of . . . operations," characteristic of the "wide-reaching" relationships in the franchise context that was so critical to the exercise of personal jurisdiction in *Burger King* and *Choice Hotels*.[5]

---

[5]The facts and circumstances in this case are more analogous to those in *Talegen Corp. v. Signet Leasing and Fin. Corp.*, 104 Md. App. 663, 657 A.2d 406, *cert. denied*, 340 Md. 215, 665
(continued...)

Finally, as to "contemplated future consequences," *Burger King*, 471 U.S. at 479; *Nueva Eng'g*, 628 F.Supp. at 955; *Potomac Design*, 839 F.Supp. at 37, it is clear that the parties' choice of Minnesota law compels the conclusion that the exercise of personal jurisdiction is not constitutionally proper in this case.

The Supreme Court instructs that a choice-of-law provision should not be ignored in considering whether a defendant has purposefully invoked the benefits and protections of a State's laws for jurisdictional purposes. *See Burger King*, 471 U.S. at 482. In *Burger King*,

---

[5](...continued)
A.2d 1058 (1995). In that case, the non-resident defendant challenging personal jurisdiction in Maryland had entered into a contract with a third party. Subsequently, pursuant to the terms of the contract and with the consent of the defendant, the third party assigned the contract to the plaintiff, a resident of Maryland. Pursuant to the assigned contract, the defendant sent payments, notices and information to the plaintiff in Maryland. Reversing the trial court's determination that personal jurisdiction over the non-resident defendant was proper, the Court of Special Appeals, drawing on *Hanson v. Denckla*, 357 U.S. 235, 252 (1958), held that "the unilateral act of a third party lessor in assigning a lease agreement, which action necessarily requires the lessee to mail payments and send certain notices to the assignee, does not create the necessary 'minimum contacts' between the lessee and the State in which the assignee is located." 104 Md. App. at 674, 657 A.2d at 412.

Here, the gravamen of Southfork's contractual undertakings centered on its relationship with Lakeville, the "lender" under the Loan Agreement. Lakeville, like the third party in *Talegen*, essentially assigned, through the Indenture, all of the Security under the Loan Agreement to the Trustee, a Maryland resident. Thus, although the analogy is not exact because Southfork executed the Commitment, Southfork's situation here is not unlike that of the non-resident defendant in *Talegen*, who became associated with the resident plaintiff through a "unilateral act" (of assignment) by the original party with whom it contracted, Lakeville. *See also The Harry and Jeanette Weinberg Foundation Inc. v. ANB Investment Management and Trust Co.*, 966 F.Supp. 389 n.3 (D.Md. 1997) (distinguishing *Burger King* on "several grounds," including the fact that "national franchise agreements, such as the one involved in *Burger King*, present unique policy issues involving protection of trademarks and maintenance of uniform standards."). MuniMae's reliance on cases such as *Mininberg v. Kresch*, 863 F.Supp. 261 (D.Md. 1994), in which courts have reasoned that a mere agreement to send payments due on a promissory note into the forum is sufficient to support a conclusion that a defendant engaged in "purposeful availment," is not persuasive as I remain unconvinced of the rule's constitutionality.

the Court affirmed the understanding that a defendant "purposefully avail[s] himself of the benefits and protections of [the forum state's] laws by entering into contracts expressly providing that those laws would govern . . . disputes." *Id.*

Here, although the Commitment issued by MuniMae designated Maryland law, the superseding Loan Documents, *see* Loan Agreement at § 10.17 ("This Agreement and the other Mortgage Loan Documents constitute the entire agreement . . . and *supersede all prior oral or written agreements, commitments* or understandings with respect to the matters provided for herein and therein.")(emphasis added), make unmistakable the parties' bargained-for understanding that Minnesota law would govern the resolution of matters pertaining to this transaction.

When considered with the factors discussed above, i.e., that Southfork did not initiate the business relationship; that negotiations between the parties and the execution of the Loan Documents occurred in Minnesota; that performance under the Loan Documents to a substantial degree took place in Minnesota; and, that Southfork's relationship with the forum is attenuated, at best-- the selection by the parties, and Southfork in particular, of Minnesota law over Maryland law, when the choice of Maryland law was clearly an available option, weighs heavily in favor of the conclusion that Southfork did not intend to avail itself of the benefits and protections of Maryland law.[6]

---

[6] Just as a choice of law provision in favor of the forum state, when combined with other factors, "reinforce[s] . . . deliberate affiliation with the forum State and the reasonable

(continued...)

The foregoing examination of "[p]rior negotiations and contemplated future consequences along with the terms of the contract and the parties' actual course of dealing," *Burger King*, 471 U.S. at 479; *Nueva Eng'g*, 628 F.Supp. at 955; *Potomac Design*, 839 F.Supp. at 37, reveals that Southfork did not purposefully avail itself of the benefits and protections of Maryland law and that the exercise of personal jurisdiction over Southfork would not be reasonable.

## IV

For the reasons set forth above, I will grant Southfork's motion to dismiss for lack of personal jurisdiction. A separate order follows.

Filed: April 12, 2000

                                                  */s/ Andre M. Davis*
                                          ANDRE M. DAVIS
                                          United States District Judge

---

[6](...continued)
foreseeability of possible litigation there," *Burger King*, 471 U.S. at 482, a choice of law provision which opts away from the forum state, when combined with other factors disfavoring the exercise of personal jurisdiction, raises the negative implication that personal jurisdiction in the forum state was not contemplated. *Cf. Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 478 (4th Cir. 1993) (finding against the exercise of personal jurisdiction because, *inter alia*, unlike the *Burger King* contract, "the contract . . . contain[ed] no choice-of-law provision" and contained a provision indicating a preference for non-forum law); *Allegiant Physicians Services, Inc. v. Sturdy Mem. Hosp.*, 926 F.Supp. 1106, 1116 (N.D.Ga. 1996) (citing *Burger King* and concluding that "the parties' decision to invoke [non-forum] law, and not [forum] law, weighs against [defendant's] contacts with [the forum].").